**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SERVICE BY AIR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 14-cv-1754 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| PHOENIX CARTAGE AND AIR | ) | |
| FREIGHT, LLC, PHILIPPE GABAY, | ) | |
| and RADIANT LOGISTICS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Service By Air, Inc. ("SBA") brings this action against Defendants Phoenix Cartage and Air Freight, LLC, Philippe Gabay, and Radiant Logistics, Inc. Before the Court are Radiant's motion to dismiss [37] and Phoenix and Gabay's motion to dismiss [40]. For the reasons stated below, the Court grants Defendants' motion in part, dismissing Counts IV, V, and VI. It also dismisses Counts VIII through XI against Phoenix and Gabay.

## I.  Background[1]

Plaintiff provides international freight and global logistics services, including ocean and ground shipping. In 2014, a competing freight shipper, Radiant, purchased SBA's sales agent, Phoenix. In response to the acquisition, Plaintiff filed this action against Radiant, Phoenix, and Phillipe Gabay, owner and manager of Phoenix. The amended complaint alleges breach of contract; tortious interference with contract; intentional interference with business expectancy; federal trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C.

---

[1] For the purposes of Defendant's motions to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

§ 1114 and 15 U.S.C. § 1125(a), the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*, and common law.

A.     **SBA and Phoenix's Sales Agent Agreement**

In October 2009, Plaintiff and Phoenix entered into a Sales Agent Agreement ("SAA"), in which Phoenix agreed to act as Plaintiff's sales agent in the Philadelphia area. The SAA, which is governed by Illinois law, includes the following provisions, in relevant part:

14.     **Confidential Information and Non-Disclosure.** . . . Sales Agent and all employees shall not at any time directly or indirectly furnish to any person not directly affiliated with the SBA Network any information as to SBA's methods or techniques, SBA customer lists, or any information pertaining to operations or procedures which have been supplied by SBA. . . . Sales Agent agrees that, upon termination or expiration of this Agreement, Sales Agent shall not use, either directly or indirectly any such confidential information or trade secrets or methods and techniques of doing business learned from SBA. . . . Sales Agent further agrees that the use by a spouse or member of Sales Agent's immediate family, during or after the term hereof, of such confidential information, trade secrets, materials, SBA computer software, customer lists and its manual and procedures provided by SBA shall be deemed a violation by Sales Agent of this provision, unless such use relates solely to operations authorized herein. . . . Additionally, it shall be a violation of this Agreement for Sales Agent, or any of its employees or family members, to transport SBA computer software or any copies or reproductions thereof off site of the Premises. . . .

18.     **Transfer on Death or Mental Incapacity.** Upon the death or mental incapacity of any person with controlling interest in Sales Agent, the executor, administrator, or personal representative of such person shall transfer its interest to a third party approved by SBA within twelve (12) months after such death or mental incapacity. . . .  the personal representative of the deceased Sales Agent shall have a reasonable time, but in no event more than eighteen (18) months from Sales Agent's death, to dispose of the deceased's interest in this Agreement . . . .

21.     **Right of First Refusal**. Service By Air, Inc. will have the irrevocable first right and option to purchase Sales Agent's intangible assets and any employment contracts and leases on the same terms and conditions as any bona fide purchaser. . . . . Service By Air, Inc. may exercise this right by notifying Sales Agent of its decision in writing within thirty (30) days after receipt of a copy of the offer to purchase, which offer to purchase must contain all the terms of the proposed sale and the identity of the proposed purchaser. . . . Any sale or attempted sale without first giving SBA the right of first refusal shall be void and of no force or effect. Service By Air, Inc. shall not exercise its right of first refusal in the sale of the

Sales Agent's operations to a family member who otherwise qualifies in accordance with this Agreement.

22.     **Covenant Not to Compete**. During the term of this Agreement and for three (3) years after termination of the agreement for any reason, Sales Agent shall not directly or indirectly participate, engage nor have any interest in any freight forwarding business in the Philadelphia Metropolitan Area other than the Service By Air business. Sales Agent acknowledges that it shall be deemed a breach of this Agreement if Sales Agent's spouse or other member of Sales Agent's immediate family shall engage in any conduct prohibited in this Agreement. . . .

FAC, Ex. A at 40-51. Following various amendments and extensions, the SAA expired on

February 28, 2014.

### B.     Radiant Purchases Phoenix

As part of a larger competitive strategy, Radiant began to purchase its competitors' service agents.  Relevant here, Radiant executed an asset purchase agreement with Phoenix ("Radiant-Phoenix APA") on March 1, 2014, which Plaintiff characterizes as an acquisition.[2] Gabay had travelled to Radiant's corporate headquarters in January or February of 2014 to negotiate the APA and his upcoming employment as Vice President of Business Development for Radiant's Mid-Atlantic region.  Radiant announced both the purchase and Gabay's transfer on March 3, 2014.

---

[2] Plaintiff did not attach the Radiant-Phoenix APA to the amended complaint, initially stating that it lacked access to the document.  It attached a different asset purchase agreement involving Radiant as a buyer (the "Laredo APA"), alleging on information and belief that the terms of the Radiant-Phoenix APA paralleled those of the Laredo APA.  Phoenix subsequently attached the Radiant-Phoenix APA to its motion to dismiss.  "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.  Such documents may be considered by a district court in ruling on the motion to dismiss." *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (citation omitted).  The Radiant-Phoenix APA is central to Plaintiff's claims, and Plaintiff does not dispute its accuracy.  On the contrary, its response motion adopts it as part of the pleadings.  Thus, in evaluating the plausibility of the contract and tort claims related to the Radiant-Phoenix APA, the Court focuses on the Radiant-Phoenix APA rather than the Laredo APA.  Lastly, the Court rejects Radiant's argument that, in adopting the Radiant-Phoenix APA, Plaintiff bases its claims on a new factual basis entirely inconsistent with the amended complaint, effectively amending the amended complaint in its response motion.  The amended complaint repeatedly references the Radiant-Phoenix APA, a document that is at the heart of Plaintiff's claim, even if absent from the amended complaint.

The Radiant-Phoenix APA required Phoenix to make several disclosures before closing.

Most relevant here, it included the following language:

**6.8    Conforming Customers and Non-Conforming Customers.**

(a)    <u>Conforming Customers.</u> <u>Schedule 6.8</u> contains a true and correct schedule identifying, for the 12 month period immediately preceding the Closing Date, all total and per customer revenues (without identifying the customers' names) attributable to all Conforming Customers and all total and per customer revenues (without identifying the customers' names) attributable to all Non-Conforming Customers.

Radiant MTD, Ex. B at 24.  It included the following relevant definitions:

"Conforming Customers" means all legacy customers of the Phoenix Business and all new customers of Gabay or attributable to sales personnel reporting to Gabay, however, only to the extent each of such customers is located outside of the Non-Compete Radius [which included the Philadelphia area as defined in the SAA] and with whom Seller and/or Gabay is otherwise entitled to do business without violating the [SAA, among other agreements].

*Id.* at 44.

"Non-Conforming Customers" means all legacy customers of and attributable to the Phoenix Business or any other business attributable directly or indirectly to Gabay as of and prior to the Closing Date (i) located within the Non-Compete Radius [which included the Philadelphia area as defined in the SAA]; and (ii) with whom Seller is not otherwise entitled to do business without violating the [SAA, among other agreements].

*Id.* at 48.  Paragraph 6.9 also required Phoenix to provide a "list of all of the material contracts of Seller relating to the Phoenix Conforming Business."  *Id.* at 24.  The agreement defined "Phoenix Conforming Business" as "the Phoenix Business relating only to the Conforming Customers."  *Id.* at 48.

These disclosure requirements are distinct from those in the Laredo APA, which, like many other standard M&A agreements, required the seller to provide the buyer with recent financial statements; a schedule identifying the seller's principle customers; a schedule

4

identifying all material contracts; and access to sites, properties, books and records as well as any additional information that Radiant may reasonably request.

Plaintiff alleges that Phoenix and Gabay additionally disclosed confidential information after the SAA expired. More specifically, at 5 p.m. on February 28, 2014, Phoenix and Gabay shut down Plaintiff's remote access to its proprietary freight forwarding software on the Phoenix computer system. Plaintiff allegedly used this software to track customer's shipping information. After shutting down Plaintiff's access, Phoenix allegedly maintained access to the software, including customer and shipment history information. Lastly, Plaintiff alleges that Phoenix directly or indirectly used confidential information, trade secrets, or methods and techniques of doing business learned from Plaintiff after the SAA expired.

After Radiant announced the acquisition, Phoenix, Gabay and Radiant allegedly attempted to transfer their shared customers with Plaintiff to Radiant. For example, on March 3, 2014, Lori Meyer, a Phoenix employee emailed Plaintiff's customers, stating, "As of March 1, 2014 SBA PHL has joined with Radiant Global Logistics one of the fastest growing freight forwarding companies in North America. We are the same dedicated team you are accustomed to but now able to offer you a more robust solution in servicing your transportation and logistic needs as part of Radiant." FAC, Ex. J at 1. She provided her new email address and the new office email address, both of which were Radiant email addresses. The amended complaint also alleges that Gabay personally solicited the business of at least one SBA customer in the Philadelphia area. In support of this allegation, Plaintiff attaches an affidavit of one of Plaintiff's employees, stating that he observed Gabay's signature in the "sign in" log in of a shared Phoenix-SBA customer in the Philadelphia Metropolitan area in June 2014. FAC, Ex. G. Lastly, on June 3, 2014, Phoenix, Gabay and Radiant allegedly sent an email advertising Radiant's

services to customers and potential customers serviced by Phoenix while operating as Plaintiff's sales agent. The email falsely stated that the owner of the copyright in the advertisement was "SBA Global Logistics – Philadelphia." FAC, Ex. P at 4. The email also displayed Plaintiff's mailing address. *Id.* This activity allegedly caused Plaintiff to lose customers. In 2012 and 2013, Plaintiff collected approximately $1 million in annual revenues from Phoenix's territory. After the SAA expired, SBA's revenues from the same accounts dropped below $30,000 in 2014.

The amended complaint alleges various contract claims arising from the acquisition. Count I alleges that Phoenix and Gabay violated the SAA's right of first refusal ("ROFR") provision by failing to provide Plaintiff any notice of Radiant's offer. In addition to praying for damages, it requests rescission of the asset purchase, contending that Radiant is therefore a necessary party to the count. Count II alleges that Phoenix breached the SAA's non-compete clause by providing competing freight services in Philadelphia after the acquisition. Count III alleges that Phoenix breached the SAA's non-disclosure provision by giving Radiant confidential information about Plaintiff before and after the Radiant-Phoenix APA closed.

Plaintiffs also allege various tort claims. Count IV alleges that Gabay tortuously interference with the SAA by inducing Phoenix to violate the ROFR, non-compete, and non-disclosure provisions. Count V alleges that Radiant tortuously interfered with the SAA by inducing Phoenix to provide Radiant with information in violation of the SAA's non-disclosure provision. Counts VI and VII allege intentional interference with business expectancy against Gabay and Radiant, respectively, alleging that they interfered with Plaintiff's reasonable expectation of retaining its customer relationships, proprietary data and methods as well as its rights under the ROFR.

Finally, Counts VIII through XI allege that Defendants infringed Plaintiff's trademarks in violation of the Lanham Act, 15 U.S.C § 1114 and 15 U.S.C. § 1125(a); 815 ILCS 510/1 *et seq.*; and common law, respectively. SBA owns and uses the marks SERVICE BY AIR, SBA GLOBAL LOGISTIC SERVICES, SBA GLOBAL LOGISTIC SERVICES & Design, and SBA & Design, which correspond to U.S. Trademark Registration No. 3,438,446, No. 4,389,059, No. 4,389,061, and No. 3,616,733, respectively. Plaintiff alleges that, after the asset purchase, Defendants willfully used Plaintiff's trademarks to provide the same services sold by Plaintiff to the same target customers using the same third-party vendors and the same channels, including tradeshows, email marketing, search engine marketing, paid search advertising through Google and Yahoo, and its website, "sbaglobal.com." Phoenix and Gabay allegedly referenced and continue referencing Phoenix's previous status as Plaintiff's sales agent. The amended complaint alleges that these activities have caused confusion among SBA's customers, potential customers, and third-party vendors as to the source of Defendants' and Plaintiff's respective services, and as to Defendants' affiliation, connection or association with SBA.

## II.     Legal Standard On Motion To Dismiss

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which

it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III. Analysis

### A. Phoenix and Gabay

#### 1. Breach of ROFR By Phoenix (Count I)

Phoenix and Gabay move to dismiss Count I, which alleges that Phoenix breached the SAA's ROFR by failing to notify Plaintiff of Radiant's offer to purchase Phoenix. The ROFR provides that "Service By Air, Inc. may exercise this right by notifying Sales Agent of its decision in writing within thirty (30) days after receipt of a copy of the offer to purchase, which offer to purchase must contain all the terms of the proposed sale and the identity of the proposed purchaser." FAC, Ex. A at 50. Defendants read this language to mean that an offer could only trigger the ROFR if (i) it took place before the SAA expired, (ii) it was in writing, and (iii) it

included all the terms of the proposed sale. Phoenix and Gabay move for dismissal, arguing that the Plaintiff failed to allege that Radiant's offer satisfied all three of these requirements.

The Court accepts that the first requirement existed, as both parties agree that an offer must have preceded the expiration of the SAA. The Court is less persuaded that Plaintiffs must allege that Radiant's offer satisfied the second and third requirements. First, Defendants' present the bulk of this argument in their reply brief, thereby walking the fine line of forfeiture. See *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (a district court is "entitled to find that an argument raised for the first time in a reply brief is forfeited"). Even assuming they have not forfeited their argument, the language of the ROFR does not establish these requirements as clearly as Defendant argues. Reading this provision in light of the business interests that generally underlie a ROFR, the Court finds it plausible that the provision instead required *Phoenix* to give *Plaintiff* all the terms of a proposed sale in writing, regardless of whether the underlying offer was in writing. Because it is plausible that the second and third requirements did not exist, the only issue before the Court is whether Plaintiff adequately alleges the first requirement—that Radiant offered to purchase Phoenix before the SAA expired.

The amended complaint alleges that the SAA expired on February 28, 2014. The Radiant-Phoenix APA, a detailed forty-page contract, lists an effective date of March 1, 2014. Plaintiff alleges that Gabay negotiated the APA at Radiant's headquarters in January or February 2014. Plaintiff contends that Radiant therefore must have offered to purchase Phoenix before the SAA expired. Plaintiff's allegation that the offer occurred before the SAA expired is more than plausible based on the size and detail of the Radiant-Phoenix APA, its effective date of March 1, and the timing of Gabay's alleged visit to Radiant headquarters. Accordingly, the Court denies Defendants' motion to dismiss Count I against Phoenix.

## 2.    Breach of ROFR by Gabay (Count I)

Phoenix and Gabay also move to dismiss Count I's breach of contract claim against Gabay, arguing that the SAA did not bind Gabay personally.  The primary goal of contract interpretation is to give effect to the parties' intent.  *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011).  To determine the parties' intent, the Court first examines the language of the contract, reading the contract holistically rather than reading its provisions piecemeal.  *Id.*  Where language is susceptible to more than one meaning, it is ambiguous, and a court may consider extrinsic evidence to determine the parties' intent.  The Court gives unambiguous language its plain, ordinary and popular meaning.  *Id.*

Several provisions plausibly indicate intent to bind Gabay personally.  The confidentiality and non-disclosure provision refers to the "spouse or member of Sales Agent's immediate family" as well as "Sales Agent, or any of its employees or family members."  FAC, Ex. A ¶ 17. The transfer on death or mental incapacity provision refers to "the personal representative of the deceased Sales Agent" and "Sales Agent's death."  *Id.* at ¶ 18.  The ROFR provision refers to "the sale of the Sales Agent's operations to a family member."  *Id.* at ¶ 21.  The non-compete provision refers to "Sales Agent's spouse or other member of Sales Agent's immediate family." *Id.* at ¶ 22.

Defendants argue that other provisions only identify Phoenix as Sales Agent, not Gabay. As to those provisions, Defendants may be correct, in which case the meaning of Sales Agent may be ambiguous.  At this stage of the litigation, however, the Court does not determine whether Sales Agent is an ambiguous term, and, if so, what it means.  It only considers the plausibility of Plaintiff's allegation that the contract bound Gabay personally.   The cited provisions provide sufficient factual support for SBA's allegation that the contract was binding

on Gabay. Finding that SAA's language plausibly indicates intent to bind Gabay, the Court need not consider Defendants' remaining arguments with respect to this count.

### 3. Prayer for Rescission of the Radiant-Phoenix APA (Count I)

Plaintiff asks the Court to rescind the asset purchase, arguing that the SAA renders any sale in violation of the ROFR void. Defendants move to strike this prayer for relief, arguing that Plaintiff waived all equitable remedies in the Agreed Order [19], dated March 19, 2014. An Agreed Order is a contract governed by the general contract interpretation principles recited above. *In re Delaney's II, Inc.*, 1991 WL 337625, at *2 (N.D. Ill. June 12, 1991); *Boatman* ex rel. *Boatman v. Sullivan*, 1990 WL 146699, at *2 (N.D. Ill. Oct. 1, 1990). The Agreed Order came before the Court specifically "upon (1) Plaintiff Service By Air, Inc.,'s ("SBA") Amended Motion for Temporary Restraining Order and Preliminary Injunction . . . (2) Defendant Radiant Global Logistics, Inc.'s ("Radiant's") Joint Motion to Transfer," the parties "having agreed to a resolution of Plaintiff SBA's motion." Agreed Order at 1. The Agreed Order later states that it "shall not be considered the admission or adjudication of any fact or the determination of any legal issue, and is the result of an agreement between the parties with regards to the request by SBA for temporary, preliminary or permanent equitable relief in this proceeding, and the objection of Radiant, Phoenix and Gabay to such relief." Agreed Order at 3-4. Defendants highlight the language "permanent equitable relief," arguing that Plaintiff waived all equitable relief in this action. However, the rest of the sentence, the remaining language in the contract, and the transcript of the March 19, 2014 hearing before this Court, after which the Agreed Order was entered, make clear that the parties only intended for the Agreed Motion to resolve Plaintiff's pending Motion for a TRO and Preliminary Injunction. Accordingly, the Court denies Defendants' motion to strike the prayer for rescission.

### 4.     Breach of Covenant Not to Compete By Phoenix (Count II)

Phoenix and Gabay move to dismiss Count II, in which Plaintiff alleges that Phoenix breached the SAA's covenant not to compete.  More specifically, Plaintiff argues in its response brief that Phoenix breached this covenant in two ways: (i) selling its assets to Radiant and (ii) operating within Radiant following the sale.  Defendants move for dismissal, first arguing that a mere sale of assets falls outside the scope of the non-compete provision.  Specifically, they argue that non-compete provision could not have prohibited a sale of assets because the ROFR expressly contemplates Phoenix's ability to sell its assets to a party other than Plaintiff.  The Court is not persuaded by Defendant's argument at this early stage of the case.  Based on a review of the non-compete and the ROFR provisions, it is at least plausible that an agent's sale of the principal assets to its competitor could have violated the non-compete provision.

Plaintiff's second argument—that Phoenix breached the agreement by operating within Radiant post-sale—does not state a claim for breach of the non-compete provision.  It ignores both the nature of the sale and the corporate form.  Radiant did not purchase Phoenix, the LLC.  It only purchased some of its assets.  Post-sale, Phoenix did not exist within Radiant; only some of its assets did.  Radiant's operation of these assets alone does not make it plausible that Phoenix violated the non-compete provision.  Accordingly, Count II survives, but only Plaintiff's first theory remains viable.

### 5.     Breach of Non-Disclosure Provision By Phoenix (Count III)

Phoenix and Gabay move to dismiss Count III, which alleges that Phoenix gave Plaintiff's confidential information to Radiant before and after the asset purchase, violating the SAA's non-disclosure provision.  More specifically, Count III alleges that Phoenix breached the SAA's non-disclosure provision by (i) disclosing its customer list, (ii) giving Radiant access to

Phoenix's sites, books and records prior to the expiration of the agreement, (iii) maintaining access to SBA's proprietary software and data after the SAA expired, (iv) using confidential information or trade secrets or methods and techniques of doing business learned from Plaintiff prior to and after the SAA's expiration, and (v) shutting down Plaintiff's remote access to its own computer before the SAA expired.

The third alleged violation, and only the third alleged violation, makes Count III factually plausible. Assuming that Phoenix maintained access to SBA's proprietary software and data, including confidential information protected under the SAA's non-disclosure provision. Phoenix plausibly transferred this access to Radiant when it sold its Philadelphia assets and transferred its employees to Radiant.[3]

Phoenix and Gabay argue that Count III is mooted by the Agreed Order insofar as it requires designated employees of Radiant (formerly Phoenix) to continue processing certain remaining orders by Plaintiff's customers using Plaintiff's software. But this requirement does not appear to preclude Phoenix's liability for giving Radiant access to Plaintiff's software before the entry of the Agreed Order. Accordingly, the Court denies Defendants' motion to dismiss Count III.

### 6. Tortious Interference Claims Against Gabay (Counts IV and VI)

Phoenix and Gabay move to dismiss Count IV, which alleges that Gabay tortuously induced Phoenix to breach the SAA by causing it to violate the ROFR, non-compete, non-disclosure, and confidentiality provisions, and Count VI, which alleges that Gabay tortuously

---

[3] The remaining allegations are insufficient to state a claim for breach of non-disclosure. The first two disclosures are factually implausible insofar as they were required under the Laredo APA and not the Radiant-Phoenix APA. The fourth alleged violation is implausible insofar as it lacks any factual support in the amended complaint. The fifth alleged violation cannot give rise to liability under Count III insofar as it does not involve an actual disclosure.

interfered with Plaintiff's business expectancy in its customer relationships, proprietary data and methods, and its ROFR. Specifically, they argue that Gabay is protected from personal liability under both counts due to Illinois's corporate officer privilege.

Under Illinois law, corporate officers are privileged to interfere with contracts. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 157 (Ill. 1989); *Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 651-52 (7th Cir. 2012). The privilege maximizes firm value by incentivizing officers to prioritize the interests of shareholders over those of contract creditors. See *id.* (citing *Swager v. Couri*, 77 Ill. 2d 173, 190-91 (Ill. 1979); *Certified Mech. Contractors, Inc. v. Wight & Co.*, 162 Ill. App. 3d 391, 400 (2d Dist. 1987)); *Nation v. Am. Capital, Ltd.*, 682 F.3d 648, 651-52 (7th Cir. 2012). By mitigating the risk of personal liability, the privilege also leaves corporate officers freer to exercise their business judgment in their shareholders' best interests. See *HPI*, 131 Ill. 2d at 158; *Naeemullah v. Citicorp Servs., Inc.*, 78 F. Supp. 2d 783, 793 (N.D. Ill. 1999).

To overcome the corporate officer privilege, a plaintiff must allege that the officer's conduct was unjustified or malicious. See *HPI Health Care Servs., Inc.*, 131 Ill. 2d at 158; *Swager*, 77 Ill. 2d 185; *H.F. Philipsborn & Co. v. Suson*, 59 Ill.2d 465, 474 (1974); *Loewenthal Securities Co. v. White Paving Co.*, 351 Ill. 285, 299 (1932)).[4] Conduct is unjustified if it is

---

[4] The Seventh Circuit has suggested that, under Illinois law, a lack of justification may not be a pleading requirement; instead, justification may be an affirmative defense. *Nation*, 682 F.3d at 652 n.2 ("Illinois courts have been unclear about whether the issue of conditional privilege is part of the plaintiff's claim—that is, an aspect of the plaintiff's burden to prove that the defendant's interference with his contract was unjustified—or an affirmative defense to be proved by the defendant." In explaining this ambiguity, the Seventh Circuit cites *Roy v. Coyne,* 259 Ill. App. 3d 269, 283 (1st Dist. 1994), which states that the Illinois Supreme Court's language in *HPI* "certainly does not foreclose the possibility that justification can be an affirmative defense ... rather than an absence of justification being an essential element...." *Roy v. Coyne* does provide that privilege or justification is generally an affirmative defense rather than a pleading requirement, reasoning that defendants are better suited than plaintiffs to bear this burden. *Id.* at 281. However, *Roy* acknowledges that "where the complaint [itself] establishes the existence of a privilege, the plaintiff must plead and later prove that defendant acted unjustifiably." *Id.* at 238 (citing *HPI* and *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991)). Because the amended complaint

"totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege." *HPI*, 131 Ill. 2d at 158. See also *Nation*, 682 F.3d at 653 (the corporate officer privilege can be overcome if the defendant "induced the breach to further [its] personal goals or to injure the other party to the contract, *and* acted contrary to the best interest of the corporation") (quoting *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 866-67 (7th Cir. 2009)); *George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.,* 719 F.2d 1326, 1333 (7th Cir. 1983) (same). Courts require plaintiffs to plead a lack of justification to prevent "the inevitable chilling effect that would occur if [corporate defendants] could be subject to litigation every time they exercised their business discretion" to cause their corporations not to perform a contract. *HPI*, 131 Ill. 2d at 158. The same privilege and pleading requirements for overcoming the privilege apply to the related tort of interference with business expectancy. See *e.g.*, *Schuler v. Abbott Labs.*, 265 Ill. App. 3d 991, 995-96 (1st Dist. 1993); *MGD, Inc. v. Dalen Trading Co.*, 230 Ill. App. 3d 916, 920 (1st Dist. 1992); *3Com Corp. v. Electronics Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 938 (N.D. Ill. 2000).

Because the amended complaint establishes that Gabay is an officer of Phoenix, Illinois's corporate officer privilege applies. Plaintiff therefore must allege that Gabay's conduct was unrelated or antagonistic to Phoenix's interests. It does not. On the contrary, it suggests that Phoenix's and Gabay's interests were closely aligned. Gabay and his wife owned 100% of Phoenix, and Phoenix allegedly was Gabay's alter-ego; SBA suggests that Phoenix and Gabay breached the SAA and took their customers to Radiant because doing so benefited both of them. Accordingly, the privilege applies, and the Court dismisses Counts IV and VI.

> ### 7. Trademark and Unfair Competition Claims Against Gabay and Phoenix (Counts VIII through XI)

---

establishes Gabay's officer status, Plaintiff must plead a lack of justification.

Phoenix and Gabay move to dismiss the claims of trademark infringement and unfair competition against Gabay. To state a claim for trademark infringement or unfair competition under federal law, a plaintiff must allege that: (1) it has a protectable right in the asserted trademarks; and (2) the defendant's use of the mark is likely to cause confusion. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673-74 (7th Cir. 2001). The requirements are the same under Illinois law. See *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir. 1983); *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 884 (N.D. Ill. 2013).

Defendants move to dismiss the claims against Gabay, arguing that Plaintiff fails to satisfy the special pleading requirements for alleging trademark infringement or unfair competition against a corporate officer. Under *Dangler v. Imperial Mach. Co.* and progeny, officers are not personally liable for the corporation's infringement, including infringement committed under their general direction.[5] *Dangler*, 11 F.2d 945, 947 (7th Cir. 1926). See also *Syscon, Inc. v. Vehicle Valuation Servs.*, *Inc.*, 274 F. Supp. 2d 975, 976 (N.D. Ill. 2003) ("Despite its vintage, *Dangler* remains the law of this Circuit"); *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 885 (N.D. Ill. 2013) (same). An exception exists where a plaintiff makes a "special showing" that the officer acted "willfully and knowingly." *Id.* A complaint makes this "special" showing where it alleges that an officer "personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or

_____

[5] Although *Dangler* arose in the patent infringement context, it since has been applied in trademark infringement cases brought under federal and Illinois law. See *Peaceable Planet, Inc. v. TY, Inc.,* 185 F.Supp.2d 893, 896 (N.D. Ill. 2002) (collecting patent and trademark cases); *Desmond v. Chicago Boxed Beef Distributors, Inc.*, 921 F. Supp. 2d 872, 885-87 (N.D. Ill. 2013); *Lang Exterior, Inc. v. Lang Windows, Inc.*, 2012 WL 3545703 (N.D. Ill. Aug. 16, 2012).

when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability." *Id.*

The amended complaint alleges that Gabay committed the trademark and unfair competition violations while acting as Vice President of Business Development for Radiant's Mid-Atlantic region. *Dangler*'s special pleading requirement therefore applies. The amended complaint fails to satisfy this requirement because it does not allege Gabay's personal involvement with Radiant's post-acquisition use of Plaintiff's marks. At most, it alleges that Gabay personally visited a former SBA customer and solicited its business. This example does not allege his personal involvement with Radiant's use of a mark. At a more fundamental level, it does not allege use of a mark at all, failing to satisfy even the basic pleading requirements of trademark infringement and unfair competition. Accordingly, the Court dismisses Counts VIII through XI against Gabay.

Phoenix and Gabay also move to dismiss the trademark infringement and unfair competition claims against Phoenix. Counts VIII through XI allege that Phoenix used Plaintiff's trademarks while operating within Radiant. As explained above, this argument ignores both the nature of the sale and the corporate form. Pursuant to the Radiant-Phoenix APA, Radiant purchased some of Phoenix's assets, not Phoenix, the LLC. Radiant's operation of Phoenix's former assets is not tantamount to Phoenix's existence within Radiant. Accordingly, the Court dismisses Counts VIII through XI.

### B. Radiant

#### 1. Tortuous Interference With Contract (Count V)

Phoenix moves to dismiss Count V, which alleges that Radiant tortuously interfered with the SAA by inducing Phoenix to violate the non-disclosure provision. To state a claim of

intentional interference with contract, a plaintiff must plead (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages. *Dopkeen v. Whitaker*, 399 Ill. App. 3d 682, 684 (1st Dist. 2010). Radiant moves to dismiss Count V, arguing that the third element is factually implausible given the disclosure requirements under the Radiant-Phoenix APA. It argues that, if anything, the agreement shows that Radiant intentionally avoided requiring disclosures prohibited under the SAA. The language of the Radiant-Phoenix APA supports Radiant's argument. The disclosure requirements expressly instructed Phoenix not to disclose the identities of Plaintiff's Philadelphia customers, and to the extent they required Phoenix to disclose a list of material contracts, they only required a list of material contracts relating to the Phoenix Conforming Business. These provisions support Radiant's argument, particularly insofar as they contrast from the disclosure requirements in the Laredo APA. The Laredo APA, like many other standard M&A agreements, required more extensive disclosures, including financial statements from up to two years earlier; a schedule identifying the seller's principle customers; a schedule identifying all material contracts; and access to sites, properties, books and records as well as any additional information that Radiant may reasonably request. Given the carefully crafted and limited nature of the disclosures in the Radiant-Phoenix APA, it is implausible that Radiant intentionally induced Phoenix to make disclosures in violation of the SAA.

In response, Plaintiff argues that the Radiant-Phoenix APA required Phoenix to make other disclosures—for example, a good standing certificate, a certificate of organization, and a balance sheet. But none of these documents fall within the SAA's non-disclosure provision;

accordingly, they cannot give rise to the claim brought under Count V.  Plaintiff also argues that it is "inconceivable. . . that Radiant would have purchased the assets of Phoenix without first reviewing those protected customer lists in order to evaluate the potential benefits of the transaction."  Resp. at 5.  Plaintiff's one-sentence argument is factually unsupported and exaggerated.  It is conceivable that Radiant crafted the disclosure requirements to avoid liability, particularly as Radiant may have had alternative means of learning (or at least estimating) the value of Phoenix's Non-Conforming business.  Lastly, Plaintiff fails to argue that Phoenix's alleged disclosures after the asset purchase make Count V factually plausible.  Even if Plaintiff had made this argument, it would have failed.  The amended complaint alleges that Phoenix maintained access to Plaintiff's software post-acquisition.  However, it does not allege that Phoenix's employees used this software post-acquisition, that they gave other Radiant employees access to it, or that Radiant intentionally and unjustifiably induced Phoenix to maintain access to the software.  The amended complaint also alleged that Phoenix directly or indirectly used confidential information, trade secrets, or methods and techniques of doing business learned from Plaintiff after the SAA expired, but it provided no factual support for that allegation.

Plaintiff also argues that Radiant tortuously induced Phoenix to breach the ROFR provision.  In support of this contention, the response brief extensively argues that Radiant must have made an offer before March 1, while the SAA was still active.  The Court agrees that Radiant plausibly made an offer before March 1, but this allegation, without more, is insufficient to support a tortious interference claim.  Radiant was free to offer to purchase Phoenix.  Under the SAA, Phoenix then had to disclose the terms of the offer to Plaintiff.  Plaintiff argues that Radiant made an offer.  But it fails to allege that Radiant induced Phoenix not to disclose the

offer to Plaintiff. Accordingly, Count V fails to state a claim that Radiant tortuously induced Phoenix to breach the ROFR.

### 2. Intentional Interference With Business Expectancy (Count VII)

Radiant moves to dismiss Count VII's claim that Radiant intentionally interfered with Plaintiff's business expectancy. To state a claim of intentional interference with business expectancy, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship; (2) the defendant's knowledge of the expectancy; (3) the defendant's intentional and unjustified interference that prevents the realization of the business expectancy; and (4) damages resulting from the interference. *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 862 (1st Dist. 2008). Intentional interference with business expectancy differs from intentional interference with contract in that an "individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract." *Belden Corp. v. InterNorth, Inc.*, 90 Ill. App. 3d 547, 552, 413 N.E.2d 98, 102 (1st Dist. 1980).

Plaintiff claims that Radiant interfered with its business expectancy in (1) its customer relationships, (2) its confidential information, and (3) its ROFR. The first allegedly arose from Plaintiff's expectancy of entering into a valid business relationship with customers in the Philadelphia area. In contrast, the latter two allegedly arose from the contract between Plaintiff and Phoenix, not Plaintiff's mere expectancy of entering into a business relationship with Phoenix; accordingly, they give rise to a claim of intentional interference with contract, not business expectancy. In addressing Count VII, the Court therefore limits its inquiry to whether the amended complaint states a claim that Radiant tortuously interfered with its expectancy in its customer relationships.

Radiant first argues that Count VII fails to state a claim because Plaintiff does not plead the fourth element of tortuous interference with business expectancy: damages. Radiant's argument is unpersuasive because the amended complaint expressly states that "[i]n 2012 and 2013, Plaintiff collected approximately $1 million in annual revenues from Phoenix's territory. After the SAA expired, SBA's revenues from the same accounts dropped below $30,000 in 2014," FAC at ¶ 58, attributing this loss to Radiant's acquisition of Plaintiff's customers and potential customers following the asset purchase.

Radiant also argues that Count VII fails to state a claim because Radiant is protected under the competitor's privilege. Under Illinois law, commercial competitors are privileged to interfere with each other's business expectancy. *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 392, 882 N.E.2d 1011, 1019 (Ill. 2008). The purpose of the privilege is to promote competition, benefiting consumers. See *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999) ("[C]ompetition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort"). In light of this purpose, the competitor's privilege does not protect "improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement." *Id.*

After *HPI*, which required plaintiffs to overcome the corporate officer privilege in the complaint itself, Illinois courts similarly required plaintiffs to overcome the competitor's privilege in the complaint. See *e.g.*, *Mannion v. Stallings & Co.*, 204 Ill. App. 3d 179, 189-90 (1st Dist. 1990); *Vill. of Lake Barrington v. Hogan*, 272 Ill. App. 3d 225, 234 (2d Dist. 1995); *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 732 (7th Cir. 1999). More recently, however, the Illinois Supreme Court characterized the competitor's privilege as "an

affirmative defense to the tort of intentional interference with prospective business advantage," without providing a reason for the apparent change, *Gen. Motors Corp. v. State Motor Vehicle Review Bd.*, 224 Ill. 2d 1, 15 (Ill. 2007), and a complaint filed in federal court need not anticipate an affirmative defense, *U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003). Federal courts therefore have not required plaintiffs to overcome the competitor's privilege in the complaint itself. See *e.g.*, *Global Material Technologies, Inc. v. Dazheng Metal Fibre Co., Ltd,* 2014 WL 1099039, at *5-6 (N.D. Ill. Mar. 20, 2014); *XPO Logistics, Inc. v. Gallatin*, 2013 WL 3835358, at *6 (N.D. Ill. July 24, 2013); *Quantum Foods, LLC v. Progressive Foods, Inc.*, 2012 WL 5520411, at *3 (N.D. Ill. Nov. 14, 2012); *Hypergraphics Press, Inc. v. Cengage Learning, Inc.*, 2009 WL 972823, at *4 (N.D. Ill. Apr. 8, 2009). Like other courts in this district, this Court will not require Plaintiff to anticipate the competitor's privilege in the complaint. Accordingly, the Court denies Radiant's motion to dismiss Count VII on the basis of the competitor's privilege.

Lastly, Radiant argues that Count VII is factually implausible because Radiant deliberately structured the asset purchase to protect Plaintiff's business expectancy in its customers. More specifically, the "Post-Closing Operations" provision of the Radiant-Phoenix APA prohibited Phoenix and Gabay from violating the SAA's covenant not to compete and from servicing or contacting any Non-Conforming Customers during the SAA's non-compete period. Radiant MTD, Ex. B at 36-37. It also required them to comply with all post-closing covenants relating to the termination of the SAA. *Id.* at 37. The Court finds it plausible that, despite this language, Radiant's employees subsequently attempted to take Plaintiff's Non-Conforming customers. For example, Moyer's email, sent after the Radiant-Phoenix APA took effect, transitioned Phoenix's old customers to Radiant. In addition, Plaintiff attaches an affidavit of an

SBA employee, stating that he observed Gabay's signature in the "sign in" log in of an SBA customer in the Philadelphia Metropolitan area in June 2014, making it plausible that Gabay solicited a Non-Conforming Customer during the non-compete period. Accordingly, the Court denies Radiant's motion to dismiss Count VII.

## IV.    Conclusion

For the foregoing reasons, the Court grants Defendants' motions to dismiss [37 and 40] in part, dismissing Counts IV, V, and VI as well as Counts VIII through XI against Phoenix and Gabay.


Dated: January 28, 2015

_____
Robert M. Dow, Jr.
United States District Judge